**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**DALE JEREMIAH SHALVEY, also known as "DJ"**<br><br>　　　　**Defendant.** | **Case No. 21-cr-00334-001-TJK** |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Dale Jeremiah Shalvey, also known as "DJ", to fifty-one months' incarceration, at the top of the stipulated Sentencing Guidelines range of 41 to 51 months, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

## I.   INTRODUCTION

The defendant, Dale Jeremiah Shalvey, a thirty-eight-year-old farmer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred

1

police officers, and resulted in more than 2.8 million dollars' in losses.[1]

Shalvey, a commercial farmer, (1) assaulted a Metropolitan Police Officer on the West Front of the Capitol by hitting him with an object at close range; (2) breached the U.S. Capitol through the Senate Wing Door after witnessing the police fight to keep rioters out of the building; (2) entered sensitive areas of the Capitol building, including the Speaker of the House's Suite and the Senate Chamber; (3) rifled through Senators' desks, took pictures of their documents, and stole and destroyed a letter written by Senator Mitt Romney; (4) remained in the Capitol for almost an hour while the Certification was halted; (5) lied to the FBI and told them that he did not assault officers or witness any assaults on officers; (6) threw away the phone that he had at the Capitol, which contained evidence of his crimes; and (7) has yet to express any remorse for his crimes.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

In order to avoid unnecessary exposition, a brief summary of the January 6, 2021 attack on the United States Capitol Building by hundreds of rioters, Shalvey among them, is set forth in the Statement of Offense for this case. ECF 73 at ¶ ¶ 1 to 7.

### B.    Defendant's Role in the January 6, 2021 Attack on the Capitol

#### *The Approach to the Capitol Building*

On January 6, 2021, Shalvey and codefendants Tara Aileen Stottlemyer (Stottlemyer)

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

and Katharine Hallock Morrison (Morrison) drove to Washington, D.C. to protest Congress' certification of the Electoral College vote. Morrison also told Shalvey and Stottlemyer that she wanted to go to D.C. and hear former President Donald Trump speak. *See* Statement of Offense, ECF 73, ¶ 8.   Morrison, Shalvey, and Stottlemyer attended the Women for Trump rally and then marched with other protestors to the Capitol. *Id*.

Morrison, Shalvey, and Stottlemyer went to the West Front of the Capitol near the Inauguration stage. Police officers there attempted to prevent rioters from accessing the Capitol Building but were met with violence by the rioters.   Morrison used her phone to record the activity on the West Front, including Image 1 below, which shows the police equipped with impact weapons to repel rioters. Morrison also captured Shalvey in a video recording, a still shot of which is Image 2 below showing a bearded Shalvey wearing a brown cap and green coat.

**Image 1**          **Image 2**



***Images 1 and 2 are stills of photos taken by Morrison of the police attempting to repel rioters on the West Front of the Capitol, with Shalvey circled in yellow.***

Another series of photos from open sources captured Shalvey and Morrison on the West Front while the police tried to prevent rioters from entering the Capitol building.

**Image 3**



*In Image 3, Shalvey is shown in the yellow circle on the West Front of the Capitol in an open-source photo at* https://www.gettyimages.com/detail/news-photo/trump-supporters-clash-with-police-and- security-forces-as-news-photo/1230454354

Another photo from open sources captured Morrison and Shalvey on the West Front while the police tried to prevent rioters from entering the Capitol building.

**Image 4**



***In Image 4, Morrison and Shalvey (in the brown cap) are shown in the blue square on the West Front of the Capitol observing rioters fighting the police in this image, which is located at https://www.gettyimages.com/detail/news-photo/trump-supporters-clash-with-police-and- security-forces-as-news-photo/1230454354.***

Body worn camera (BWC) footage of Metropolitan Police Department (MPD) officers A.F. and N.M. also captured Shalvey on the West Front as he hit an officer at close range with an object, the impact of which can be heard on the officer's BWC; this occurred at approximately 2:09 p.m. Shalvey's cowardly act is displayed in Exhibits 1 and 2, still shots of which are shown below.   Stottlemyer was also captured in the BWC video draped in a Trump flag, wearing sunglasses and a bicycle helmet. Morrison was not captured in the video. Notably, the dispersal instructions are also audible in the video; instructions that the trio ignored as they remained on the West Front.

**Image 5**



*Image 5 is a still from Exhibit 1, which is BWC video of MPD officer A.F. capturing Stottlemyer (circled in red) watching Shalvey (circled in yellow) throw an object at MPD officer N.M. on the West Front at approximately 2:09 p.m.*

*Image 6*



**Image 6 is a still from Exhibit 2, which is BWC video of MPD officer N.M. capturing
Shalvey throwing an object at him on the West Front at approximately 2:09 p.m.**

**Image 7**



**In Image 7 Shalvey is shown in the yellow circle on the West Front of the Capitol, observing
rioters fighting the police, in a photo located at https://www.gettyimages.com/detail/news-
photo/trump-supporters-clash-with-police-and- security-forces-as-news-photo/1230454390.**

A video from that area also captured the mayhem as police tried to repel the rioters and the dispersal order blared. Shalvey is captured in that video. A still of that video is shown below in Image 8

**<u>Image 8</u>**



*Still from a video located at https://archive.org/details/hK7jTZ4xJaAhboeem where at time code 25:09 Shalvey is shown on the West Front of the Capitol with rioters who were fighting the police.*

*Breach of the Capitol Building and Shalvey's Entry into the Capitol*

At approximately 2:13 p.m., rioters made the first breach of the Capitol Building at the Senate Wing as depicted below in Image 9, which is a still shot from United States Capitol Police closed circuit television recordings (CCTV).

**Image 9**



***Image 9 is a still of CCTV, which captures rioter breaching the Capitol Building at approximately 2:13 p.m. at the Senate Wing***

At approximately 2:22 PM, approximately nine minutes after the Capitol Building was breached, Morrison, Shalvey, and Stottlemyer entered through the Senate Wing door. All three wore helmets. *See* Exhibit 3, CCTV of Senate Wing door at approximately 2:22 p.m. The following is a still image from Exhibit 3.

**Image 10**



***Still from Exhibit 3, capturing Morrison (circled in blue), Shalvey (circled in yellow), and Stottlemyer (circled in red) breaching the Capitol Building through the Senate Wing door.***

Shortly thereafter, members of the Senate and the House of Representatives were forced to evacuate. ECF 74, ¶ 7. After entering the building, Morrison, Shalvey, and Stottlemyer advanced to the Crypt, entering it at approximately 2:24 p.m. while other rioters packed that area as shown below in a still shot from Exhibit 4.

**Image 11**



***Image 11 is a still from Exhibit 4 of Morrison, Shalvey, and Stottlemyer entering the Crypt, with all three defendants circle in red.***

While celebrating in the Crypt, Shalvey yelled, "Fuck yeah!" *See* Exhibit 5.

**Image 11**



***Image 11 is a still from Exhibit 5 depicting Shalvey yelling "Fuck yeah" while in the Crypt.***

At approximately 2:25 p.m., the rioters overran the police line in the Crypt. Morrison, Shalvey, and Stottlemyer joined that crowd and pushed further into the Capitol building. *See* Exhibit 6, which is CCTV of the rioters overrunning the police line in the Crypt.

**Image 12**





*Image 12 is a still from Exhibit 6 of rioters overrunning the police in the Crypt with the defendants circled in red.*

Morrison, Shalvey, and Stottlemyer advanced from the Crypt through the Memorial

door to a hallway leading into the Rotunda. *See* Exhibit 7, which is CCTV of a hallway leading to the Rotunda.

**Image 13**



***Image 13 is a still of Exhibit 7 depicting defendants proceeding to the Rotunda.***

Morrison, Shalvey, and Stottlemyer then entered the Speaker of the House's suite and left the suite within approximately 27 seconds. *See* Exhibit 8.

**Image 14**



***Image 14 is a still of Exhibit 8 depicting Shalvey (circled in yellow) seconds before he entered the Speaker of the House's Suite to his left.***

The defendants then went to the Rotunda. The defendants were in the Rotunda from approximately 2:33 to 2:39 p.m. While there, they joined with other rioters who were celebrating. They also gathered in what appeared to be a prayer circle. *See* Exhibit 9, which is CCTV of rioters in the Rotunda.

**Image 15**



***Image 15 is a still from Exhibit 9, depicting Morrison, Shalvey, and Stottlemyer circle in red in the Rotunda huddled with other rioters.***

Morrison, Shalvey, and Stottlemyer then went to the third floor of the Capitol. As they walked through the halls there, Shalvey stole zip ties from a cabinet. *See* Exhibit 10. He showed the zip ties to Morrison and Stottlemyer in the Senate Gallery hallway.   Shalvey then appeared to discard the zip ties in the hallway. *See* Exhibit 11**,** which is CCTV of the Senate Gallery hallway.

**Image 16**



*Image 16 is as still from Exhibit 10 where Shalvey (circled in yellow) is captured stealing zip ties.*

**Image 17**



*Image 17 is as still from Exhibit 11, depicting Morrison (circled in blue), Shalvey (circled in yellow), and Stottlemyer (circled in red) in the Senate Gallery hallway and Shalvey showing zip ties to Morrison and Stottlemyer.*

The trio then went to the Senate Chamber Press Gallery and back to the second floor where they were confronted by a locked Senate door. The defendants clearly knew they were outside the Senate at this point - Morrison photographed the Senate door with her phone as shown in Image 18. At the same time, and in the same area as Morrison, Shalvey searched through the desk outside of the door while Stottlemyer watched Shalvey. *See* Image 19 and Exhibit 12.

**Image 18**



*Image 18 is a still of a photograph Morrison took of a Senate door.*

**Image 19**



*Image 19 is a still of Exhibit 12, depicting Morrison (in the blue circle), Shalvey (in a yellow circle), and Stottlemyer (in a red circle) in the Senate Chamber Press Gallery.*

The trio's advance into the Capitol building continued. A very limited number of rioters breached the Senate Chamber where the Certification was scheduled. Morrison, Shalvey, and Stottlemyer were in that group. They entered the Senate Chamber at approximately 2:49 p.m. and were some of the first rioters to advance that far in the Capitol building. Once inside, Morrison, Shalvey, and Stottlemyer rifled through Senators' desks, and took pictures of documents on, and in, their desks. Shalvey is also captured on video placing a document in his backpack. *See* Exhibit 13, which is a recording from the Senate Chamber surveillance camera. Still shots from Exhibit 13 are below in Images 20 – 25, with Morrison circled in blue, Shalvey in yellow, and Stottlemyer in red.

21

**Image 20**



*Image 20 is as still from Exhibit 13 showing the defendants enter the Senate Chamber with Morrison (circled in blue), Shalvey (circled in yellow), and Stottlemyer (circled in red).*

**Image 21**



*Image 21 is as still from Exhibit 13 showing the defendants in the Senate Chamber with Morrison (circled in blue) and Shalvey (circled in yellow) examining documents and Stottlemyer (circled in red) walking.*

**Image 22**



*Image 22 is as still from Exhibit 13 showing the defendants in the Senate Chamber with Morrison (circled in blue) examining an open desk, Shalvey using his phone (circled in yellow), and Stottlemyer examining documents (circled in red).*

**Image 23**



*Image 23 is as still from Exhibit 13 showing Morrison (circled in blue) photographing documents in the Senate Chamber.*

**Image 24**



*Image 24 is as still from Exhibit 13 showing Shalvey (circled in yellow), and Stottlemyer (circled in red) photographing documents in the Senate Chamber.*

**Image 25**



*Image 25 is a still from Exhibit 13 showing Shalvey (circled in yellow) place a document in his backpack in the Senate Chamber.*

Morrison used her phone to record CSPAN's television broadcast; it showed that the Senate was in recess as the rioters occupied the Capitol, thus delaying the Certification. Images 25 – 29 below also depict stills of the documents in the Senate that she recorded, including a letter from Senator Romney to Vice-President Pence, a map of the Capitol, and a note to the president of the Senate – Vice President Pence. *See* Exhibits 14 – 18.

**Image 25**



***Image 25 is a still from Exhibit 14 which is a recording that Morrison made capturing rioters on the Senate Floor.***

25

**Image 26**



*Image 26 is a still from Exhibit 15, which is a recording that Morrison made of a letter from Senator Romney to Vice-President Pence.*

**Image 27**



*Image 27 is a still from Exhibit 16, which is a recording Morrison made of a map of the Capitol.*

**Image 28**



*Image 28 is a still from Exhibit 17, which is a recording Morrison made of a note to the president of the Senate – Vice President Pence.*

**Image 29**



***Image 29 is a still from Exhibit 18, which is a recording Morrison made of a CSPAN's television broadcast showing that the Senate was in recess as the rioters occupied the Capitol.***

The trio also gathered with other rioters in the Senate Chamber and reviewed documents that they thought pertained to the pending Certification. *See* Exhibit 19. In the video, Morrison instructed Shalvey to, "take a picture of that" as Shalvey held a document in his hand, which appeared to be the same document that Morrison photographed in Image 19, Senator Romney's letter to Vice-President Pence.    Shalvey then told his fellow rioters to "look" at another document he found, and Stottlemyer stated it was "Ted Cruz's objection to the Arizona [inaudible]." These defendants clearly were working together in the Senate Chamber to find Certification related material.

29

**Image 30**



*Image 30 is a still from Exhibit 19, depicting Shalvey (circled in yellow) holding a document, which Morrison (circled in blue) instructed Shalvey to photograph.*

**Image 31**



**Image 31 is a still from Exhibit 19 depicting Stottlemyer (circled in red) state "Ted Cruz's objection to the Arizona [inaudible]" while *Shalvey (circled in yellow) held up a document in the Senate Chamber.***

Morrison, Shalvey, and Stottlemyer exited the Senate Chamber at approximately 2:59 p.m. They finally left the Capitol building through the Senate Carriage door at approximately 3:05 p.m., having spent approximately 43 minutes in the Capitol building.    Yet, the trio lingered on Capitol grounds for almost another hour and did not leave until 3:57 p.m. as shown below in Image 25.

**Image 32**



***Image 32 is a still of CCTV, which captures Morrison, Shalvey, and Stottlemyer leaving Capitol grounds at approximately 3:57 p.m.***

On March 9, 2021, Shalvey responded to the FBI's Washington D.C. Field Office, where he was arrested regarding his illegal activity at the Capitol on January 6, 2021. The FBI read Shalvey his *Miranda* rights and he voluntarily waived those rights and interviewed with the FBI agents. In his interview, Shalvey falsely claimed that he was unaware of any assaults on police and that he did not participate in any violent acts.    In the interview, the FBI warned Shalvey not to lie and that if he did, he could be subject to prosecution under Title 18 U.S.C. § 1001(a)(2). Shalvey

did admit that while in the Senate Chamber he stole a letter written by Senator Mitt Romney to Vice-President Michael Pence, sent a photos of it to a friend, and then destroyed it. He also admitted that he threw away the phone that he had in the Capitol on January 6th. Shalvey, however, misrepresented his intentions of going to the Capitol and told the FBI that he went to Washington D.C. on January 6th to sell sausages.

### III.   THE CHARGES AND PLEA AGREEMENT

On February 2, 2022, a federal grand jury returned a superseding indictment charging Shalvey with 11 federal offenses: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Two); Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C.  § 1512(c)(2) and § 2 (Count Three); Theft of Personal Property Within Special Maritime and Territorial Jurisdiction, in violation of 18 U.S.C. § 661 (Count Four); False Statements, in violation of 18 U.S.C. § 1001(a)(2) (Counts Five and Six); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 7); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 8); Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A) (Count 9); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 10); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 11).

On October 3, 2022, Shalvey pled guilty to Count Two, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 § 111(a)(1) and Count Three, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2).

## IV.     STATUTORY PENALTIES

Shalvey now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) and Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2).

As noted by the plea agreement and the U.S. Probation Office, Shalvey faces a maximum of 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Assaulting, Resisting, or Impeding Certain Officers. Shalvey also faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Three, Obstruction of an Official Proceeding.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

That Guidelines analysis, as stipulated by the parties in their plea agreement, is as follows:

Count Two: 18 U.S.C. § 111(a)(1):

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a) & (b) | Official Victim | +6 |
| | Total | **20** |

Count Three: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a)    Base Offense Level | | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) Obstruct Administration of Justice | | +8 |
| U.S.S.G. § 2J1.2(b)(2) Substantial Interference | | +3 |
| | Total | **25** |

| | |
|---|---|
| U.S.S.G. § 3D1.2(c) Combined Offense Level | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-3</u> |
| **Total Adjusted Offense Level:** | **22** |

*See* Plea Agreement ¶¶ 5(A) and Presentence Investigation Report (PSR) ¶¶, 50 - 60.[2] As accurately noted in the pre-sentence report, "Counts 2 and 3 are grouped, pursuant to USSG §3D1.2(c) because one of the counts [Count Two] embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the count [Count Three]." PSR ¶ 48. Specifically, Shalvey's assault on a police officer was conduct that is the basis for the eight-level enhancement of the offense level for Count Two because it amounted to "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). "For Counts grouped pursuant to USSG §3D1.2(a)-(c), the offense level applicable to a Group is the offense level which produces the highest offense level. The guideline at USSG § 2J1.2(a) produces the highest offense level." PSR ¶ 48.

The U.S. Probation Office calculated Shalvey's criminal history as category I, which is not disputed. PSR ¶ 63. Accordingly, based on the parties' stipulated calculation of Shalvey's total

---

[2] Based on the facts and circumstances of Shalvey's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because a sentence within the Guidelines range of 41-51 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

adjusted offense level, after acceptance of responsibility, at 22, Shalvey's Guidelines imprisonment range is 41 to 51 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.

The nature and circumstances of Shalvey's crimes weigh heavily towards a significant term of incarceration. After observing police officers outside the Capitol attempting to stop rioters from entering the Capitol, Shalvey assaulted an officer by hitting him with an object. Shalvey then unlawfully breached the Capitol building through the Senate Wing doors only nine minutes after it was first breached by rioters. He was part of a mob or rioters that overran the police there, went in the Speaker of the House of Representatives' office, and was one the few rioters who advanced into the Senate Chamber. There, Shalvey, and his co-defendants, searched in Senators' desk and took photos and recordings of their documents and destroyed a letter written by Senator Romney to Vice-President Pence.

Shalvey's actions on January 6 show an absolute disregard for the rule of law. His actions were violent and directly delayed the certification. Shalvey also appeared to revel in his actions as he yelled "Fuck yeah" as he and his fellow rioters overran the police in the Crypt.

### B. Shalvey's History and Characteristics

Shalvey is thirty-eight years old with no criminal history. He is a commercial farmer and owns the company Free Folk Pastures, LLC. PSR ¶ 87.   In June 2021, six months after the riots at the Capitol, Shalvey married his co-defendant Stottlemyer. PSR ¶ 73. The PSR reported that Stottlemyer is pregnant and was due to give birth in February 2023.   *Id*. Probation cites no basis for a departure or variance from a guideline sentence based upon Shalvey's history including the impending birth of his child. That is consistent with the Guidelines instruction that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Shalvey's criminal conduct, assaulting a police officer, disobeying the command to leave Capitol grounds, corruptly obstructing of an official proceeding by entering the Senate Chamber, searching for and photographing Senate documents, and destroying one of those documents, is the epitome of disrespect for the law as are Shalvey's false statements to the FBI.

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. It was only after Shalvey was arrested that he showed any remorse for his actions and statements. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble.") (statement of Judge Chutkan).

Shalvey was on the West Front and assaulted a MPD Officer there. He also was present when the police broadcast a loud dispersal order on the West Front. Nonetheless, he still breached the Capitol, advanced deep into the building to the Senate Chamber, and searched Senators' desks, while remaining in the Capitol for almost an hour. He also destroyed a document he obtained there and his phone that he had at the Capitol. In addition, he lied to the FBI regarding assaulting and officer at the Capitol. These actions demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes.

---

[3]  *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

One comparable case is *United States v. Ronald Sandlin*, 21-cr-00088 (DLF). Sandlin pleaded guilty to one count of violating Section 111(a) and one count of joining a conspiracy to obstruct the Certification vote, in violation of 18 U.S.C. § 1512(k). Sandlin and his co-conspirators brought knives, bear spray, and Sandlin's M&P pocket pistol, to Washington, D.C. in advance of the rally on January 6 with the expectation that there would be violence. Sandlin directly assaulted at least two USCP officers, including by attempting to remove one officer's helmet, and abetted the assaults of four others. He led the mob's charge against officers at two separate choke points—the Rotunda doors and the Senate Gallery. He attempted to profit from his unlawful conduct on January 6 by taking steps to sell his footage of the Capitol riot to media outlets. Judge Friedrich sentenced Sandlin to 63 months' incarceration, 36 months of supervised release, and a $20,000 fine.

As of the date of this sentencing memorandum, only a few Capitol Riot defendants who reached the Senate Chamber have been sentenced for a violation of *only* 18 U.S.C. § 1512(c)(2). In *United States v. Jacob Chansley*, 21-cr-003-RCL, the defendant, a self-proclaimed Qanon shaman, made himself the face of the January 6 attack. Chansley climbed a tower on the way into the Capitol, entered the Upper West Terrace among the first 30 rioters, challenged police officers who directed rioters to leave, used a bullhorn, entered Senate Chamber floor, said former Vice President Pence was a traitor, left note on Senate dais, and gave tv interviews. Chansley's sentencing guidelines range was 41-51 months, and Judge Lamberth sentenced Chansley to 41 months' imprisonment for his violation of Section 1512(c)(2). Shalvey's actions rival Chansley's

in obstructing the Certification but are more heinous as they involve assaulting an officer and lying to the FBI regarding the assault and destroying evidence which included Shalvey's phone and a note written by Senator Romney.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[4] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Shalvey must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Stottlemyer played in the riot on January 6.[5] Plea Agreement at ¶ 10. As the plea agreement reflects, the riot

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9

41

at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Shavley's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 118.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 51 months, which is a high-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, a fine, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052


By:    /s/ Anthony L. Franks
      ANTHONY L. FRANKS
      Assistant United States Attorney
      Bar No. 50217MO
      555 Fourth Street, N.W., Room
      Washington, DC   20530
      anthony.franks@usdoj.gov
      (314) 539-3995

(D.D.C. 2012) (citations omitted).